# 14-2752
# XAP 14-2890

## THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

**CEDAR PETROCHEMICALS, INC.**

       **Plaintiff Appellant/Cross-Appellee,**

    - v. -

**DONGBU HANNONG CHEMICAL CO., LTD.**

       **Defendant Appellee/Cross Appellant.**

---

**BRIEF IN SUPPORT OF CEDAR'S APPEAL OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK'S JUDGMENT DISMISSING CEDAR'S SUIT & ITS ORDER DENYING CEDAR'S MOTION TO AMEND THE COURT'S FACTUAL FINDINGS AND ALTER ITS JUDGMENT**

John T. Lillis
Nathan T. Williams
Kennedy Lillis Schmidt & English
75 Maiden Lane, Suite 402
Tel: 212.430.0800

## THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

CEDAR PETROCHEMICALS, INC.

Plaintiff Appellant/Cross-Appellee,

- v. -

14-2752
14-2890

DONGBU HANNONG CHEMICAL CO., LTD.

Defendant Appellee/Cross Appellant.

Appellant, Cedar Petrochemicals, Inc. ("Cedar"), by its attorneys, Kennedy Lillis Schmidt & English, respectfully submits this Brief in support of its appeal.

## I.     INTRODUCTION

In May 2005, Cedar agreed to purchase and Dongbu Hannong Chemical Co., Ltd. ("Dongbu") agreed to sell 2,000 metric tons ("mt") of liquid phenol, a petrochemical. Under the Parties' initial agreement, Dongbu was obligated to deliver Phenol with a color subsisting at or below 5 Hazen[1] to Cedar's nominated Vessel, the M/T BOW FLORA ("BOW FLORA"), at the Port of Ulsan, South Korea's Anchorage. Later, the Parties modified their contract by

---

[1] Unit of color measured on the Platinum-Cobalt scale.

1

substituting the quality specifications of Cedar's customer, Ertisa, S.A. ("Ertisa"), for the Parties' originally agreed upon specification, so Cedar could resell the Phenol to Ertisa. Under this revised agreement, Dongbu was obligated to deliver Phenol with a color subsisting at or below 10 Hazen to the BOW FLORA.

Dongbu sourced the Phenol from Kumho P&B Chemical Co. ("Kumho"). Dongbu loaded the Phenol from two of Kumho's Yosu, South Korea-based Shoretanks into a feeder vessel, the C/V GREEN PIONEER ("GREEN PIONEER"), and four days later, transshipped the Phenol to the BOW FLORA. Initial tests on samples drawn from the Shoretanks, the GREEN PIONEER, and the BOW FLORA suggested the Phenol was pure, on-specification, and sound as contractually required. However, upon the BOW FLORA's arrival in Rotterdam, the Phenol was markedly off-specification for color despite having been handled properly aboard the BOW FLORA. As such, in accordance with industry practice, a series of retained samples drawn during various phases of the Phenol's carriage were tested to determine at what stage of the voyage the Phenol was damaged. Taken together, the test results prove the Phenol was not pure and carried a latent defect when Dongbu delivered it. Therefore, Dongbu breached the Parties' contract by failing to deliver Phenol subsisting at or below 10 Hazen, fit for Cedar's resale to Eritsa.

## II.    JURISDICTIONAL STATEMENT

Cedar is a New York corporation, and Dongbu is a Korean corporation. JPTS Undisputed Facts ¶1,3, DE150, Appx.47 (Vol.III). Cedar sued Dongbu in the U.S. District Court for the Southern District of New York ("District Court") (06 Civ. 3972 (AJN) (JCF)) and alleged principal damages in excess of $1.5M. Third Amended Complaint, Docket Entry ("DE") 40. Therefore, the District Court had subject-matter jurisdiction over Cedar's suit pursuant to 28 U.S.C. § 1332. On 21 October 2013, the Court held that Cedar failed to prove that the Phenol was injured prior to Dongbu's delivery and, accordingly, dismissed Cedar's suit.    Order, DE182, Appx.750-771 (Vol.III); Judgment, DE183, Appx.772-777 (Vol.III).  On 18 November 2014, Cedar moved the District Court, pursuant to Fed.R.Civ.P 52(b) and 59(e), to amend its factual findings and alter its judgment ("Reconsideration Motion").    Reconsideration Motion & Supports, DE184-188, 197, Appx.778-837, 920-933 (Vol.III).  On 30 June 2014, the District Court denied Cedar's Reconsideration Motion.    Order, DE202, Appx.951-954 (Vol.III).  Cedar filed its timely notice of appeal on 28 July 2014.  Cedar Notice of Appeal, DE203, Appx.995-96 (Vol.III).    Thus, this Court has jurisdiction over Cedar's appeal pursuant to 28 U.S.C. § 1291 as it is an appeal from the District Court's final decisions disposing of Cedar's suit.

3

### III.    QUESTIONS PRESENTED

A.    *Did the District Court abuse its discretion by (1) prohibiting Cedar from explaining, in its post-trial memorandum, how its seeding theory proved that Phenol was injured when Dongbu delivered it, (2) then deciding – without the aid of post-trial memoranda – that Cedar's seeding theory was contradicted by Cedar Exhibits 70A-70P ("Literature"), and (3) then refusing to adjudge the merits of Cedar's Reconsideration Motion, which explained how the District Court misread the Literature, because – in the District Court's opinion – Cedar should have addressed its seeding theory in its post-trial memorandum?*

**Proposed Answer:**  Yes.  The Federal Rules of Civil Procedure provide litigants a mechanism for seeking reconsideration of evidence misapprehended by the District Court.  While the standard for "granting" such motions is "strict," a movant is entitled to have its reconsideration motion adjudged on its merits if it can point to controlling evidence that the court overlooked (i.e. matters reasonably expected to alter the court's conclusion) – provided the movant does not advance new facts, issues, or arguments or seek to relitigate issues.  In its Reconsideration Motion, Cedar explained how the District Court misread the Literature and the experiments discussed therein.  In doing so, Cedar did not advance new facts, issues, or arguments but rather asked the District Court to reconsider Cedar's seeding theory in light of a correct reading of the Literature.  Therefore, Cedar was entitled to have its Reconsideration Motion adjudged on its merits, and the District Court abused its discretion when it refused to reconsider its decision because – in its mistaken opinion – Cedar was only entitled to address its seeding theory in its "post-trial briefings," not in a reconsideration motion. This is particularly true because the District Court never afforded Cedar an opportunity to brief its seeding theory because it instructed the Parties to presume, for the purposes of their post-trial memoranda, that the Phenol was injured when Dongbu delivered it.  Therefore, at minimum, this matter must be remanded to the District Court, so it can evaluate the merits of Cedar's Reconsideration Motion.

4

B.   *Did the District Court clearly err by holding that Cedar failed to prove that the Phenol was injured when Dongbu delivered it when (1) the Parties stipulated that Phenol discolors gradually – not instantaneously or rapidly as the District Court held; (2) the Literature support Cedar's seeding theory; (3) the quantities of catalysts, oxidizing agents, and contaminates introduced in the experiments discussed in the Literature illustrate that the Phenol could not have discolored instantaneously or rapidly; (4) Cedar's expert never conceded that the Literature contradicted his seeding theory; (5) Ertisa's documentation and testimony on blending support Cedar's seeding theory; (6) difference in the Phenol's storage and carriage conditions and timing of sampling limited the ability of the Parties' quality-inspection regime to produce the kind of perfect data the Court suggested should exist; and (7) the evidence clearly does show that the Phenol was injured when Dongbu delivered it?*

**Proposed Answer:**   Yes.   The Parties stipulated that Phenol discolors gradually – not instantaneously or rapidly.   In contravention of this binding stipulation, at trial, Dongbu invoked passages from Literature to contend that Phenol discolors instantaneously or rapidly.   The Literature explains that Phenol can discolor through oxidation and that such oxidation proceeds via slowly unfurling, temperature- and oxygen-dependent free-radical chain reactions the ultimate by-products of which are colored "reaction products." This is the process Cedar's expert described as "seeding," and it explains how the Phenol was injured when Dongbu delivered it despite the fact that preliminary tests showed that the Phenol was "on-specification" at that time. Further, Cedar's expert never conceded that the Literature contradicted his seeding theory, and Ertisa's documentation and testimony on blending support Cedar's seeding theory because both note that Phenol discoloration is an irreversible process, which comports with the Literature and Cedar's seeding explanation.   Last, because the Phenol originated in two separate Shoretanks, was carried aboard the GREEN PIONEER in five separate Vessel Tanks, and only commingled in BOW FLORA Tank 13C, the District Court erred by expecting that results from tests on samples pulled from various stages of the Phenol's carriage would provide a perfect upward slope of data points.   When plotted, the data illustrate an exponential color change that comports with the discussion in the Literature and Cedar's

5

seeding theory. Therefore, the District Court clearly erred when it held that Cedar did not prove that the Phenol was injured when Dongbu delivered it.

C.   *Did the District Court err by not holding Dongbu liable for breaching the Parties' Contract when the evidence showed the Phenol was injured when Dongbu delivered it and the Parties stipulated that, upon such a showing, Dongbu would be liable for breaching the Parties' Contract?*

**Proposed Answer:**  Yes. The Parties stipulated that, if Cedar proved that the Phenol was injured when Dongbu delivered it, Dongbu would be liable. Cedar did so. Therefore, Dongbu is liable for breaching the Parties' contract, and this matter must be remanded to the District Court for an evaluation of Cedar's damages.

III.   STATEMENT OF THE CASE

  A.   RELEVANT PROCEDURAL HISTORY:
      JUDGE SWAIN'S DENIAL OF THE PARTIES'
      SUMMARY-JUDGMENT MOTIONS

After discovery, the Parties cross-moved for summary judgment. Parties' Summary Judgment Motions, DE68 and DE80. Judge Swain denied both motions because factual issues required trial. Memorandum Order, DE118, Appx.42-43 (Vol.I). However, Judge Swain resolved certain legal questions raised by the Parties' dispute. Specifically, Judge Swain held (1) that the Parties' Contract was governed by the U.N. Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, S. Treaty Doc. No. 98-9 (1983), 19 I.L.M. 671 (1980), reprinted at 15 U.S.C. App. (1998) ("CISG"), *Id.* at Appx.38-40; (2) that Dongbu would be liable for breach of contract if Cedar proved the Phenol was injured before Dongbu delivered it to the BOW FLORA (regardless of when Cedar

discovered the injury),[2] *Id.* (discussing CISG Articles 35 and 36); (3) that the Contract's "entire agreement" language would only constitute a binding merger clause if the Parties actually intended for it to operate that way, *Id.* at Appx.41-42 (discussing CISG Article 8); and (4) that the District Court was obligated to consider usage in the petrochemical trade, including its internationally recognized inspection regime, in rendering its decision, *Id.* (discussing CISG Article 9).[3]

### B.    TRIAL SUBMISSIONS

#### 1.    *The Parties' Pretrial Statement*

Before trial, the Parties filed a Joint Pretrial Statement ("JPTS") in which they stipulated to "undisputed material facts" and designated for use at trial the depositions of BOW FLORA Captain, Stig Egeland ("Egeland Depo.") (PX93, Vol.VII), and BOW FLORA First Mate, Gry Berg-Nilsen ("Berg-Nilsen Depo.") (PX92, Vol.VII). JPTS Undisputed Fact & Depositions Offered at Trial, DE150, Appx.46-56, 59 (Vol.III). Further, the Parties stipulated that, if "Cedar proves, by a preponderance of the evidence, that the injury to the Phenol occurred before the Phenol passed the rail of the BOW FLORA[,]" "then Cedar has established

---

[2] Therefore, Cedar does not have to prove the cause of the Phenol's deterioration to hold Dongbu liable. Rather, it only has to show that the Phenol was already injured when Dongbu delivered it to the BOW FLORA.

[3] CISG Articles 8, 9, 35, 36 are quoted in the attached Appendix.

Dongbu's liability;" if it does not, "Cedar's claims against Dongbu are dismissed." JPTS Agreed Legal Issues ¶3, Appx.47 (Vol.III).

### 2. *The Parties' Trial Submissions*

The District Court ordered the Parties to submit direct testimony in declaration form. At trial, Cedar introduced the trial declarations of

(1) Cedar's Korean agent, Cho Yong of H.V. Co., Ltd. ("HVC") ("Yong Decl."), PX89, Appx.2116-2169 (Vol.VII);

(2) Cedar's Owner and Chief Executive, Salim Harfouche ("Harfouche Decl."), PX87, Appx.1998-2074 (Vol.VII);

(3) Cedar's Operations and Logistics Manager, Charlene Silva ("Silva Decl."), PX90, Appx.2170-98 (Vol. VII);

(4) Ertisa's Senior Vice President, Fernando Irisarri Gonzalez ("Irisarri Decl."), PX88, Appx.2075-2115 (Vol.VII);

(5) SGS Netherlands disport surveyor, J.N.A. van de Giesen ("Giesen Decl."), PX91, Appx.2199-2204 (Vol.VII),

(6) Cedar expert, Martin East ("East Decl."), PX85, Appx.1846-1917 (Vol.VI), and

(7) Cedar expert, John Minton ("Minton Decl."), PX86, Appx.1918-1997 (Vol.VI).

Dongbu introduced the trial declaration of Dongbu's Daolin Chu ("Chu Decl."), PX1, Appx.959-63 (Vol.IV).

Cedar declined to cross-examine Mr. Chu, and Dongbu declined to cross-examine Mr. Yong, Ms. Silva, and Mr. van de Giesen. Trial Stipulation, DE163, Appx.109-112 (Vol.I). Cedar presented Messrs. East, Minton, Harfouche, and Irisarri for examination at trial.

## C. RELEVANT FACTS

### 1. *Usage in Petrochemical Trading*[4]

As explained by Judge Swain, CISG Article 9 requires the District Court to consider trade usage in rendering its decision. In the petrochemical industry, a petrochemical trader purchases a quantity of petrochemicals, at a specified quality, at a designated price, from a seller in one region of the globe and ships it to another region for resale on the same quality terms but at a higher price. Harfouche Decl., PX87¶8, Appx.1999 (Vol.VII). In this way, the buyer exploits price differences across the global market. *Id.* In making its purchase, the buyer intends to receive homogeneous Phenol free from latent defect that will remain sound (within the quality specifications) over the course of transit so it may consummate its resale on the same quality specifications on which it executed the original purchase. *Id.* at ¶9. This intent is well known to sellers of petrochemicals who, as traders, are regularly purchasers in other transactions. *Id.* at ¶10.

---

[4] Cedar's evidence regarding trade usage in the petrochemical industry was uncontroverted.

Because transoceanic shipment is implicit in such transactions, in addition to issues of supply and demand, the parties determine the selling price based on an internationally recognized shipping term, such as CFR (Cost & Freight), CIF (Cost, Insurance, Freight), or FOB (Free on Board). *Id.* at ¶11. The shipping term defines and orders the parties' respective responsibilities (e.g. arranging transport, procuring insurance, delivering conforming goods, paying purchase price, accepting delivery) and allocates risk of loss between the buyer and seller over the course of the product's carriage. *Id.*

2.    *The Petrochemical Industry's Internationally Recognized Inspection Regime*[5]

Once parties agree to such terms, they employ an internationally recognized inspection regime to monitor the quality of product being shipped over the course of its carriage. East Decl., PX85¶14, Appx. 1849 (Vol. VI); Trial Transcript ("TT") 227:15-229:18 (East), Appx. 441-43 (Vol. II). At loadport, the interested parties – via an independent surveyor(s) – draw and test a sample of the product in store in a shoretank storage facility to ensure the product meets the agreed quality "specification." East Decl., PX85¶15 Appx.1849 (Vol. VI). The independent surveyor retains an additional shoretank sample and/or ships one

---

[5] Cedar's evidence regarding the petrochemical industry's internationally recognized inspection regime was uncontroverted.

aboard the vessel to disport for additional testing if quality issues later arise. *Id.* at ¶16. Provided tests on the shoretank sample confirm the product in store is "on-specification," the parties begin loading the agreed quantity aboard a contractually specified vessel. *Id.* at ¶17. Often, the loading process is interrupted so the independent surveyor can test a shoreline, manifold, and/or "first-foot"[6] sample(s). *Id.* at ¶18. If such sample(s) confirms the product remains on-specification, then loading resumes to completion. *Id.* at ¶19. As with the shoretank samples, the independent surveyor usually draws an additional shoreline, manifold, and/or first-foot sample(s), which it retains and/or ships aboard the vessel to disport for additional testing if quality issues later arise. *Id.* at ¶20, Appx. 1850. After loading is completed, the surveyor draws and tests a post-load sample from the vessel to, again, ensure that the product remains on-specification. *Id.* at ¶21. The surveyor draws an additional post-load sample, which it retains and/or ships aboard the vessel to disport for additional testing if quality issues later arise. *Id.* at ¶22. Meanwhile, to protect the vessel's interests, the crew usually draws and retains its own first-foot and post-load samples in case quality issues later arise. *Id.* at ¶23. The samples tendered to the vessel for retention over the course of the voyage are stored at ambient temperature in the vessel's sample storage locker. *Id.* at ¶24.

---

[6] "First foot" samples are drawn after the receiving vessel tanks have been filled approximately twelve inches full. East Decl., PX85¶18, Appx.1849 (Vol. VI).

At disport, the interested parties – again via an independent surveyor(s) – draw and test a pre-discharge sample from the vessel tank(s) to confirm that the product has remained on-specification during transit. *Id*. at ¶25. If the pre-discharge sample shows that the quality has deteriorated, the independent surveyor will first draw and test a fresh set of samples (to confirm the initial determination). *Id*. at ¶26, Appx.1850-51. If these confirm the deterioration, all parties (including the vessel and its underwriters and the parties and their underwriters) will jointly test all samples drawn over the course of the product's carriage to determine, if possible, why and at what stage of the voyage the Phenol was damaged so the parties may determine fault. *Id*.; TT236:4-239:22 (East), Appx.450-53 (Vol. II); TT415:15-25 (Irisarri), Appx.629 (Vol. II). This inspection regime is invariably followed the world over in the shipment of petrochemicals. PX85¶27, Appx.1851 (Vol. VI); TT227:15-229:18 (East), Appx.441-43 (Vol.II).

3.    *Formation, Modification & Finalization of the Parties' Contract*

In April 2005, Cedar's Korean agent, HVC, began discussing a phenol trade with Kumho, with which Cedar had traded once before. Yong Decl., PX 89¶5, Appx.2116 (Vol.VII). In May 2005, Kumho introduced Dongbu to HVC and proposed that Dongbu and Cedar contract for the purchase and sale of Kumho-supplied phenol. Chu Decl., PX1¶4, Appx.960 (Vol. III); Yong Decl., PX 89¶5,

Appx.2116 (Vol.VII). Dongbu and HVC orally agreed that Cedar would purchase and Dongbu would sell 2,000 mt of Phenol conforming to Kumho's Standard Guaranteed Sales Specifications ("Kumho's Specifications") delivered FOB Ulsan Anchorage in exchange for $950/mt. Chu Decl., PX1¶4, Appx.960 (Vol.III); Harfouche Decl., PX 87¶15, Appx.2000 (Vol.VII); Yong Decl., PX89¶7, Appx.2117 (Vol.VII); Silva Decl., PX90¶10, Appx.2171 (Vol.VII); JPTS Undisputed Facts ¶10, DE150, Appx.48 (Vol.I); TT368:17-370:3 (Harfouche), Appx.582-84 (Vol. II).

After HVC advised Cedar of the oral agreement, Cedar faxed Contract No. T250-P1-0505NYC ("Written Contract") to Dongbu on 17 May 2005. JPTS Undisputed Facts ¶19, DE150, Appx.48 (Vol.I). The Written Contract confirmed that Cedar agreed to buy and Dongbu agreed to sell "2,000 MTS +/- 5% Seller's Option" of "Pure Phenol" as per "Kumho's Standard Guaranteed Sales Specs" "FOB Ulsan Anchorage, Korea" in exchange for "950 USD/MT" secured by an "Irrevocable Documentary [Letter of Credit] at sight." Yong Decl., PX89¶9, Appx.2117 (Vol. VII); Silva Decl., PX90¶11, Appx.2171 (Vol. VII); JPTS Undisputed Facts ¶10, DE150, Appx.47 (Vol. I). Kumho's Specifications had a Max Color of 5 Hazen. Kumho-HVC Email, PX2, Appx.964 (Vol.III); Kumho Specification, PX3, Appx.965 (Vol.III); Silva Decl., PX90¶12, Appx.2172 (Vol.VII); Yong Decl., PX89¶10, Appx.2117 (Vol. VII).

13

On 17 May 2005, Cedar applied for a letter of credit ("L/C"). JPTS Undisputed Facts ¶27, DE150, Appx.50 (Vol. I). Cedar's L/C Application incorporated Kumho's Specifications. *Id.* at 28; Cedar L/C Application, PX6, Appx.974-77 (Vol. III), Silva Decl., PX90¶13, Appx.2172 (Vol. VII). On 18 May 2005, HVC provided Dongbu with Cedar's L/C Application, which Dongbu signed, stamped, and accepted the same day. Cedar L/C Application, PX6, Appx.974-77 (Vol. III); Dongbu-HVC Email, PX7, Appx.978 (Vol. III), Yong Decl., PX89¶12, Appx.2118 (Vol. VII). On 18 May 2005, Dongbu returned a signed and stamped copy of the Written Contract. Written Contract, PX8, Appx.980-81 (Vol. III); HVC-Kumho-Dongbu Email, PX16, Appx.993-95 (Vol. III); Yong Decl., PX89¶13, Appx.2118 (Vol. VII).

As these preliminary documents were being exchanged, Cedar decided to use the subject Phenol to satisfy a pre-existing purchase-and-sale agreement with its customer, Ertisa. Cedar-Ertisa Contract, PX10, Appx.984-86 (Vol. III), Silva Decl., PX90¶15, Appx.2172 (Vol. VII); TT414:13-415:14 (Irisarri), Appx.628-29 (Vol. II). On 18 May 2005, HVC explained to Kumho that the Written Contract's Specifications would have to be modified (substituting Ertisa's Specification for Kumho's) so Cedar could resell the Phenol to Ertisa. Cedar-HVC Email, PX11, Appx.987-88 (Vol. III); Ertisa Phenol Specifications, PX12, Appx.989 (Vol.III); HVC-Kumho Email, PX13, Appx.990 (Vol. III); Yong

Decl., PX89¶14, Appx.2118 (Vol. VII). Ertisa's Specifications had a Max color of 10 Hazen. Ertisa Specifications, PX12, Appx.989 (Vol. III); Harfouche Decl., PX87¶17, Appx.2000 (Vol.VII).

On 19 May 2005, Cedar procured a Documentary L/C from ING Bank naming Dongbu as beneficiary and Korea Exchange Bank as the receiving bank ("Cedar L/C"). JPTS Undisputed Facts ¶28, DE150, Appx.50 (Vol.I); ING Cable Copy confirming opening of Documentary L/C, PX17, Appx.995 (Vol. III); Korea Exchange Bank Documentary L/C Advice A-0662-505-05517, PX18, Appx.1001 (Vol. III); Silva Decl., PX90¶21-22, Appx.2173 (Vol. VII). On 24 May 2005, Dongbu executed, stamped, and issued to Cedar Commercial Invoice EC50550401V00 ("Dongbu Invoice"). Dongbu Invoice, PX19, Appx.1006 (Vol.III). Both Cedar's L/C and Dongbu's Invoice incorporated Ertisa's Specifications in lieu of Kumho's.[7] JPTS Undisputed Facts ¶29, DE150, Appx.50 (Vol. I). Therefore, Dongbu was obligated to deliver Phenol subsisting at or below 10 Hazen so Cedar could consummate its resale to Ertisa.

---

[7] The Parties' substitution of Ertisa's Specifications for Kumho's modified the Written Contract and illustrates that the Parties did not intend for its "entire agreement" language to operate as a binding merger clause. While Dongbu admits that the Parties amended the Written Contract and that neither party provided evidence respecting how they intended the "entire agreement" language to operate, Dongbu claims that the "entire agreement" language operates as a binding merger clause. Dongbu's Supplemental Proposed Finding of Fact Conclusion of Law ¶¶10,12,163, DE168, Appx.108,114 (Vol.I). The District Court never reached this issue.

### 4. *The Parties' Stipulations on Phenol's Characteristics & Heating Requirements*

In their JPTS, the Parties stipulated that "Phenol is a white, crystalline solid at room temperature and liquefies at around 41°C." JPTS Undisputed Facts ¶11, DE150, Appx.48 (Vol.I). Further, they stipulated that Phenol "***gradually*** [discolors] if it contains impurities or is exposed to heat or light" and that such "discoloration is promoted by the action of water, light, air, and catalysts, e.g. traces of iron and copper." *Id.* at ¶¶12-13 (Emphasis added). The Parties also stipulated that "[s]torage and transferring temperature recommendations for Phenol range from 50°C-60°C." *Id.* at ¶16, Appx.49 (Vol.I).

### 5. *The Parties' Vessel Chartering*

Kumho chartered the GREEN PIONEER for its account on Dongbu's behalf to carry the Phenol from Kumho's Yosu-based Shoretanks to the Ulsan Anchorage. Undisputed Facts ¶33, DE150, Appx.51 (Vol. I); Silva Decl. PX90¶¶23-24, Appx.2173 (Vol. VII). Cedar chartered the M/V BOW FLORA to carry the phenol from the Ulsan Anchorage to Rotterdam. Silva Decl., PX90¶25, Appx.2173. In doing so, Cedar incorporated its standard heating instructions into the BOW FLORA Charter Party. Egeland Depo., PX93, 46:5-47:7, Appx.2322-23 (Vol.VII). In pertinent part, those instructions provided that the skin of the Vessel's heating coils should not exceed 60°C, that the Phenol's temperature should not fall below 50°C, that the Phenol's temperature should remain between

50°C-55°C, that the critical point for Phenol discoloration due to high temperature is approximately 60°C, and that – if the Vessel wanted to increase the Phenol's temperature – the increase should not to exceed 1°C per 24 hours. Cedar Heating Instructions, PX23, Appx.1013 (Vol.IV).

### 6. *The Parties' Independent Surveyors and Monitoring of the Phenol's Quality in Korea*

In accordance with industry practice, the Parties appointed independent surveyors SGS Korea Co., Ltd. ("SGS Korea") and Global Surveyors & Inspectors, Ltd. ("GSI") to monitor the Phenol's quality during the shore-to-ship and ship-to-ship transfers contemplated by the Parties' Contract. JPTS Undisputed Facts ¶26, DE150, Appx.50 (Vol.I); Silva Decl., PX 90¶27, Appx.2174 (Vol. VII); TT230:3-232:23, 238:13-239:22 (East), Appx.444-46, 452-53 (Vol. II).

### a. *Kumho's Shoretank FB-991 & FB-993*

Before the Phenol was loaded aboard the GREEN PIONEER, GSI certified the quantity and temperature of the Phenol stored in Kumho's Shoretank Nos. FB-991 and FB-993: Shoretank FB-991 contained 1,051.915 mt of Phenol maintained at 58°C, and Shoretank FB-993 contained 979.537 mt of Phenol maintained at 55°C. GSI Certificate of Quantity, PX34, Appx.1026 (Vol. IV).

On 21 May 2005, GSI drew and tested one sample from each of Kumho's Shoretanks. Tests on those samples showed each was on-specification

for color at LT [Less than] 5 Hazen/Max 10. SGS Korea confirmed these findings. Undisputed Facts ¶¶34-36, DE150, Appx.51 (Vol. I); Silva Decl., PX90¶27, Appx.2174 (Vol. VII). GSI retained a composite sample of the Phenol from the Shoretanks in its Ulsan storage facility (GSI Sample GSI005946, "Sample D"). JPTS Undisputed Facts ¶37, DE150, Appx.51 (Vol. I).

b. *Loading of the GREEN PIONEER & Monitoring the Phenol's Quality in Yosu*

Thereafter, Dongbu loaded 2003.432 mt of Phenol into GREEN PIONEER Tanks 2 Port (467.418 mt), 2 Starboard (462.762 mt), 3 Port (459.250 mt), 3 Starboard (478.888 mt), and 4 Center (135.552 mt). JPTS Undisputed Facts ¶38, DE150, Appx.51 (Vol. I); GSI Ullage[8] Report, PX24, Appx.1018 (Vol.IV). After the GREEN PIONEER was loaded, GSI determined that the Phenol temperature was 56.5°C in all five of the GREEN PIONEER Tanks. Further, SGS Korea drew[9] and tested a composite sample of the Phenol from those Tanks and determined that it was on-specification for all parameters, including color at 3 Hazen/Max 10. Undisputed Facts ¶39, DE150, Appx.52 (Vol. I). Both SGS Korea and GSI pulled additional composite samples from the GREEN PIONEER and

---

[8] Ullage: "[T]he amount wanting when a cask, on being gauged, is found to be completely full." BLACK'S LAW DICTIONARY, 5th Ed. (1979).

[9] When sampling petrochemicals, SGS Korea used new, clean sample bottles. JPTS Undisputed Facts ¶43, DE150, Appx.50 (Vol.I).

tendered them to the BOW FLORA for retention (GSI Sample GSI0002387, "Sample 3"; SGS Sample 859048, "Sample 5"). Undisputed Facts ¶¶40-41, DE150, Appx.52 (Vol. I); GSI Sample Report, PX27, Appx.1019 (Vol.IV); SGS Korea Sample Report, PX46, Appx.1040 (Vol.IV). SGS Korea also retained a third composite sample at its storage facility in Ulsan (SGS Sample 534093, "Sample C"). JPTS Undisputed Facts ¶42, DE150, Appx.52 (Vol. I); SGS Korea Sample Report, PX46, Appx.1040 (Vol.IV). On 21 May 2005, the GREEN PIONEER sailed for the Ulsan Anchorage. Undisputed Facts ¶35, DE150, Appx.51 (Vol.I).

        c.    *Loading the BOW FLORA & Monitoring the Phenol's Quality in Ulsan*

The GREEN PIONEER arrived there on 24 May 2010. JPTS Undisputed Facts ¶45, DE150, Appx.52 (Vol.I). SGS Korea measured the Phenol's temperature while still aboard the GREEN PIONEER and reported it was 56.5°C in all five Tanks. SGS Korea Ullage Report, PX42, Appx.1035 (Vol.IV). Meanwhile, GSI visually inspected BOW FLORA Tank 13 Center ("13C"), which was to receive the Phenol, and found that it was "clean and . . . suitable for the loading of the [Phenol]." GSI Vessel Certificate of Cleanliness, PX32, Appx.1024. In advance of receiving the Phenol, Tank 13C's heating coils were turned off because the BOW FLORA's crew only engages those heating coils gradually ***after***

liquid bulk chemicals requiring heating are fully loaded aboard the Vessel. Berg-Nilsen Depo., PX92, 42:21-43:11, Appx.2246-47 (Vol.VII).

Dongbu commenced transshipment of the Phenol on 24 May 2010 at 1105 hours. Undisputed Facts ¶¶46-47, DE150, Appx.52 (Vol. I); Odfjell Statement of Facts, PX29, Appx.1021(Vol.IV). The transfer had to be suspended three minutes later because the Phenol froze in the GREEN PIONEER's cargo lines. Odfjell Statement of Facts, PX29, Appx.1021(Vol.IV); Egeland Depo., PX93, 49:10-51:2, Appx. 2325-27 (Vol.VII). The GREEN PIONEER's crew applied steam to those lines to melt the Phenol back to liquid form in 20 minutes. Odfjell Statement of Facts, PX29, Appx.1021(Vol.IV); Egeland Depo., PX93, 49:10-52:23, Appx.2325-28 (Vol.VII). Thereafter, transshipment recommenced but was interrupted after the first foot of Phenol was loaded in Tank 13C so first-foot samples could be drawn. Odfjell Statement of Facts, PX29, Appx.1021(Vol.IV). The Phenol's temperature was not taken at that time because only 30 cm of Phenol had been pumped into Tank 13C making such a measurement impossible. Berg-Nilsen Depo., PX92, 56:6-57:11, Appx.2260-61 (Vol.VII).

SGS Korea drew and tested a first-foot sample and determined that it was on-specification for all parameters, including color at 4 Hazen/Max 10.

Undisputed Facts ¶48, DE150, Appx.52-53 (Vol. I); SGS Korea First Foot Certificate of Analysis, PX43, Appx.1037 (Vol.IV). The BOW FLORA's Crew pulled its own first-foot sample, and SGS pulled an additional first-foot running sample, both of which were tendered to or retained by the Vessel (Crew 'First Foot' Sample, "Sample 2"; SGS Sample 534095, "Sample B"). Undisputed Facts ¶¶50-52, DE150, Appx.53 (Vol. I); SGS Korea Sample Report, PX46, Appx.1040 (Vol.IV). Once the BOW FLORA was fully loaded, SGS Korea drew and tested a post-load running sample and determined that it was on-specification for all parameters, including color at 4 Hazen/Max 10. JPTS Undisputed Facts ¶54, DE150, Appx.53 (Vol.I). The BOW FLORA's Crew also pulled and retained its own post-load sample, and SGS Korea pulled an additional post-load running, which it tendered to the Vessel for retention (Crew Sample 'Full Tank' Sample, "Sample 1"; SGS Sample 859049, "Sample 6"). JPTS Undisputed Facts ¶¶55-56, DE150, Appx.53 (Vol. I); SGS Korea Sample Report, PX46, Appx.1040 (Vol.IV).

The test results for the samples tested contemporaneously with loading and transshipment operations in Korea in May 2005 follow:

| SAMPLE | Color (Hazen) |
|---|---|
| Yosu, Korea Shoretanks FB-991 & FB-1993 (Composite) | LT5 |
| GREEN PIONEER After Loading (Composite) | 3 |
| BOW FLORA "First Foot" After Loading | 4 |
| BOW FLORA Full Tank After Loading | 4 |

JPTS Undisputed Facts ¶¶58, DE150, Appx.54 (Vol. I).

21

7. *The Phenol's Carriage and Storage of*
*Samples aboard the BOW FLORA*

After the Phenol was fully loaded into BOW FLORA Tank 13C, GSI recorded that its temperature was 54.8°C. GSI Ullage Report, PX33, Appx.1025 (Vol.IV). On 24 May 2005, as the BOW FLORA sailed for Rotterdam, her Crew gradually engaged Tank 13C's heating coils and, thereafter, monitored the Phenol's temperature daily over the course of its carriage. *See* Berg-Nilsen Depo., PX92, 42:21-43:11, Appx.2246-47 (Vol.VII); 13C Heating Records, PX81, Appx.1818 (Vol.VI); JPTS Undisputed Facts ¶60, DE150, Appx.54 (Vol. I). Tank 13C's heating records show that the Phenol was carried between 53.5°C-55.9°C (Average: 54.83°C) while aboard the BOW FLORA. 13C Heating Records, PX81, Appx.1818 (Vol.VI).

All samples entrusted to the BOW FLORA were stored in its sample storage locker at ambient temperature. Egeland Depo., PX93, 16:10-17:25, Appx.2292-93 (Vol.VII); JPTS Undisputed Facts ¶59, DE150, Appx.54 (Vol. I).

8. *The BOW FLORA's Arrival at Rotterdam &*
*Discovery of the Phenol's Degradation*

The BOW FLORA arrived in Rotterdam on 19 July 2005. Undisputed Facts ¶61, DE150, Appx.54 (Vol. I). Over 19-22 July 2005, SGS Netherlands B.V. ("SGS Netherlands") surveyed the Phenol's temperature, quantity, and quality and summarized its findings in SGS Inspection Report 62281. *Id.* at ¶¶62-63. SGS

22

Netherlands determined that, upon arrival, the Phenol's temperature was 54.3°C and its color was gravely off-specification at >500 Hazen/10 Max. SGS Inspection Report 62281, PX56, Appx.1059 (Vol.IV); Undisputed Facts ¶64, DE150, Appx.54 (Vol. I).

### 9. *Cedar's Notice to Dongbu*

On 20 July 2005, Cedar advised Dongbu that the Phenol arrived off-specification and that Cedar held Dongbu responsible. Undisputed Facts ¶65, DE150, Appx.54 (Vol. I). On 21 July 2005, Dongbu acknowledged Cedar's claim but denied it was at fault and declined to witness joint testing of the samples drawn in Korea that had been shipped aboard the BOW FLORA ("Rotterdam Samples"). *Id.* at ¶66.

### 10. *Joint Testing in Rotterdam*

On 28 July 2005, in accordance with the industry's quality-inspection regime, the other interested parties witnessed the joint analysis of the Rotterdam Samples. JPTS Undisputed Facts ¶67, DE150, Appx.55 (Vol.I); SGS Netherlands Report 63099, PX55, Appx.1051-55 (Vol.IV). The results from the tests on the Rotterdam Samples are summarized on the following page.

| SAMPLE | Color (Hazen) |
|---|---|
| 1. Crew B. FLORA Full Tank After Loading (Ulsan) | 35-40 |
| 2. Crew B. FLORA 'First Foot' During Loading (Ulsan) | 60-70 |
| 3. G. PIONEER Composite After Loading (Yosu) | 40-50 |
| 4. B. FLORA Composite After Loading (Ulsan) | 60-70 |
| 5. G. PIONEER Running Samples Comp. Before Discharge (Ulsan) | 70-80 |
| 6. B. FLORA Running Sample After Loading (Ulsan) | 100-150 |
| 7. BOW FLORA 13 C Before Discharge (Rotterdam) | >500 |
| 8. Shore Tank 116 After Discharge (Rotterdam) | >500 |
| 9. Shore Tank 312 After Discharge (Rotterdam) | >500 |

JPTS Undisputed Facts ¶68, DE150, Appx.55 (Vol. I); SGS Netherlands Report 63099, PX55, Appx.1051-55 (Vol.IV).

### 11. *Joint Testing in Ulsan*

On 8 August 2005, Cedar, Dongbu, and Cedar's expert, Minton Treharne & Davies ("MTD"), witnessed the joint analysis of the samples SGS Korea and GSI retained in Ulsan ("Ulsan Samples). JPTS Undisputed Facts ¶74-77, DE150, Appx.56 (Vol. I). The results from the tests on the Rotterdam Samples follow:

| SAMPLE | Color (Hazen) |
|---|---|
| A. BOW FLORA Full Tank After Loading | 10 |
| B. BOW FLORA 'First Foot' During Loading | 20-30 |
| C. GREEN PIONEER Before Discharge | 30-50 |
| D. Yosu, Korea Shoretanks FB-991 & FB-1993 (Composite) | 3-5 |

*Id.* Sample C contained "small particles" but no other Ulsan or Rotterdam Sample did. *Id.* at 78. The results from tests on the Rotterdam and Ulsan Sample are compiled in PX80 on the following page.

# Phenol Colour Tests



D.    CEDAR'S "SEEDING THEORY" OF LOSS

At trial, Cedar presented John Minton of MTD as its scientific experts.  Dongbu presented no rebuttal expert(s).  MTD provides marine survey, inspection, and consultancy services for petroleum and petrochemical-related matters and has its own laboratories, which are among the most diversely capable and accredited of any in the United Kingdom.  *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.*, 769 F.Supp.2d 269 (S.D.N.Y. 2011).  MTD handles the vast majority of petrochemical claims for the London insurance market.  Minton Decl., PX86¶5-13, Appx.1919-20 (Vol. VI); TT296:17-297:22 (Minton), Appx.510-11 (Vol. II).  Minton is a chemical engineer with over forty years of experience of vessel surveying and consulting experience involving chemistry in bulk and the production and handling of chemicals.  Minton Decl., PX86¶5-13, Appx.1919-20 (Vol. VI).

In their JPTS, the Parties stipulated that Phenol can discolor if not pure or if exposed to heat, water, light, air or certain catalysts, such as copper or iron.  JPTS Undisputed Facts ¶¶12-13, Appx.48 (Vol.I).  In his trial Declaration, Cedar's expert, John Minton, confirmed this parties stipulation and explained that "this discoloration – or oxidative degradation – proceeds via free radical chain reactions initiated by exposure to [impurities, heat, water, light, air or certain

catalysts, such as copper or iron.]"  Minton Decl., PX86, ¶¶21-22, Appx.1921 (Vol.VI).  Minton further explained (1) that oxidative degradation "reaction[s] begins slowly as the first step requires the greatest activation energy," that "[t]he first oxidation products are colorless and the reaction may, therefore, proceed undetected for a time," but "[a]s time passes and greater numbers of radicals are created, the reaction rate increases and coloured products are eventually formed." *Id*. at ¶¶24-26.  Minton describes this process as "seeding":

> Minton:  Seeding is a common language word used by me . . . to describe a process where you start something off, you plant something, and it gradually develops and grows.  The proper term is a free radical reaction where, in the case of phenol, you knock a hydrogen atom off the molecule and you leave a spare electron. That's a very reactive material.  That will react with something else to form something with two spare electrons, and -- or, rather, it forms two items, each with a spare electron. And that process gradually creates more and more reactive species in the phenol and gradually the reaction goes forward and faster.

> Q.  And what does a reaction have anything to do with color.

> Minton.  The oxidative products of that reaction are colored.

TT352:20-353:7, Appx.566-67 (Vol.II).

Further, Minton explained that these free radical "seeding" reactions – like all chemical reactions – are temperature dependent:  "As a fundamental law of chemistry, heat increases chemical activity including free-radical reactions." Minton Decl., PX86, ¶¶27, Appx.1921 (Vol.VI).

Further, Mr. Minton testified that he was called on to research the cause of phenol discoloration for a series of cases he handled in the late 1980s and early 1990s. *Id.* at ¶28. From his investigations, Minton learned that the exact cause of phenol's discoloration is "nearly impossible to pinpoint" but that it is generally recognized that Phenol discoloration develops "as a by-product of free-radical reactions given phenol's chemical structure." *Id.* As will be discussed, the foregoing testimony is squarely supported by the Literature.

Based on the foregoing and his review of the data from the Rotterdam and Ulsan Samples,[10] summarized in PX80, Minton concluded:

> (1)    The Phenol in Kumho's Shoretanks was initially color stable in because the Shoretank sample tested on 20 May 2005 had a color of LT5 Hazen and Sample D, tested months later, also had a color of LT5 Hazen (3-5). See PX80, Loadport Shoretanks Column.

---

[10] Because the Rotterdam and Ulsan Samples were maintained in functionally similar conditions as solids at ambient temperatures, in previously unused, clean, clear-glass bottles that did not contain any extraneous materials prior to their use, JPTS Undisputed Facts ¶43, DE150, Appx.52 (Vol. I), Minton was able to draw conclusions from comparing the results of tests run on those retained samples. TT322:9-323:25, TT355:13-358:25 (Minton) Appx.533-34, 569-70 (Vol. II); see also TT351:24-352:5 (Minton), Appx.565-66 (Vol. II) (explaining that difference in the Ulsan and Rotterdam Samples' had a negligible impact on the color change experienced by those Samples). .

(2) Because the Phenol initially in Shoretank No. FB-991 was maintained at 58ºC and yet remained color stable, exposure to temperature at or below 58ºC would not cause the Phenol to become color unstable. GSI Certificate of Quantity, PX34, Appx.1026 (Vol. IV);

(3) The Phenol was exposed to some offending chemical specie(s) or condition(s) (e.g. scalding or overheating) in the shore loading lines or the lines and/or tanks on the GREEN PIONEER because Samples 3, 5, and C all degraded off-specification for color.

(5) That Phenol's exposure to some offending chemical specie(s) or condition(s) initiated a free-radical chemical reaction in the Phenol that developed slowly in the bulk (because it was heated) and slower in the retained samples (because they had frozen).

(6) Evidence of that reaction did not become manifest (by developing a color change) until some point after the Phenol was transferred from the GREEN PIONEER to the BOW FLORA. However, there is no question that the Phenol was injured before that transfer (as Test Results 3, 5, and C show that retained samples of Phenol that was never exposed to the BOW FLORA deteriorated for color in a similar manner as the other retained samples).

(7) Free-radical chemical reaction rates, like all chemical reaction rates, increase with increased temperature.

(8) This probably explains why the bulk's color degraded to a higher degree (e.g. to +500 Hazen) than the Rotterdam and Ulsan samples because the bulk was heated aboard the BOW FLORA (at the correct handling temperature) while the retained samples were maintain at ambient temperature.

29

(9)     The varying degree of discoloration in the retained samples suggests the free-radical reaction initiated in the shore loading lines or the lines and/or tanks on the GREEN PIONEER had not spread uniformly in the bulk by the time all retained samples had been drawn.

(10)    This explains why Test Result A shows that that sample was less effected by the offending specie or condition than Test Results 3, 5, C, 2, B, 1, 4, and 6 do on their respective samples.    However, Sample A still shows that the Phenol had been seeded before

(11)    When all sample evidence is considered, the Phenol was injured before it was transferred to the M/T BOW FLORA on 24 May 2005.

Further, Minton opined that this conclusion was bolstered by the fact that the BOW FLORS's crew would have only gradually engaged Tank 13C's heating coils after the Phenol was loaded, so the Phenol could not have been scalded during its transfer to BOW FLORA. *Id.* at ¶32.  Minton opined that it was further bolstered by the fact that the Phenol was maintained at approximately 54°C-56°C over the course of its carriage aboard the BOW FLORA. *Id.* at ¶33.

## F.    THE DISTRICT COURT'S BRIEFING INSTRUCTIONS

After closing arguments, the Court instructed the Parties to presume, for the purposes of their post-trial memoranda, that the Phenol was injured before Dongbu delivered it to the BOW FLORA:

I want a 10 page brief on the question of whether[,] if [Cedar] has established damage to the phenol prior to the Bow Flora, can Dongbu escape liability.

TT529:18-24, Appx.743 (J. Nathan) (Vol.II).

So, to be clear, the question [for the purpose of the parties' post-trial memoranda] is: If we assume that [Cedar] has established that the phenol was injured prior to the Bow Flora, is Dongbu liable?

TT531:21-24., Appx.745 (J. Nathan) (Vol.II).

[F]or purposes of our [post-trial] briefing, we are going to assume . . . [Cedar] has established that the phenol was injured prior to the Bow Flora. Question one: Is Dongbu liable? Question two: If Dongbu is liable, has [Cedar] established damages?

TT532:23-533:1. Appx.746 (J. Nathan) (Vol.II).

## F. THE DISTRICT COURT'S DECISION

On 21 October 2013, the District Court held that Cedar failed to prove, by a preponderance of evidence, that the Phenol was injured before Dongbu delivered it to the BOW FLORA. In so holding, the District Court rejected Cedar's seeding explanation of the Phenol's damage because it believed (1) the color data from the Rotterdam and Ulsan Samples should have shown a "steady upward slope" rather than one with "peaks and valleys," Opinion, DE183, Appx.768 (Vol.III); (2) the injury to the Phenol could not have remained undetected for any substantial length of time (let alone three or four days) because such "dormancy does not comport with the [Literature], which discusses the color change as occurring instantaneously or within minutes of the introduction of the

31

injurious condition;" *Id.* at Appx.768-69; (4) Cedar's "seeding" theory was contradicted the Mr. Irisarri testimony concerning blending because "any blending would, under [Cedar's] theory, inevitably lead to the sample once again worsening," *Id.* at Appx.769; and (5) Cedar's experts were incredible because, *inter alia*, (a) "Mr. Minton was unable to identify specific portions of the articles he had compiled that would support his overall theory that the injury to the Phenol could have remained undetectable during and after transfer to the BOW FLORA," (b) Cedar did not "direct the Court's attention to any such passages in any of their post-trial submissions," and (c) Mr. Minton "acknowledged, on cross-examination that specific passages in at least four of the articles described the process of phenol discoloration as occurring in a manner that directly contradicted his overall theory," *Id.* at Appx.769-71.

### G.   CEDAR'S RECONSIDERATION MOTION & THE DISTRICT COURT'S DENIAL THEREOF

On 18 November 2013, Cedar filed its Motion for Reconsideration. Reconsideration Motion & Supports, DE184-188, 197, Appx.778-837, 920-933 (Vol.III). In its memoranda in support of that Motion, Cedar reminded the District Court that it instructed the Parties to presume, for the purposes of their post-trial memoranda, that the Phenol was injured when Dongbu delivered it. As such, Cedar explained that it was never afforded an opportunity to brief its seeding

theory. Therefore, Cedar proceed to explain (1) that the Parties' stipulated that Phenol discoloration is gradual not instantaneous, (2) how the Literature supported Cedar's seeding theory; (3) why the quantities of catalysts, oxidizing agents, and contaminates introduced in the experiments detailed in the Literature illustrated that the Phenol could not have discolored instantaneously or within minutes as the District Court held; (4) that Mr. Minton never conceded that the Literature contradicted his seeding theory; (5) how Ertisa's post-loss documentation and Mr. Irissari's testimony on blending confirmed Cedar's seeding theory; (6) how the Phenol's carriage in the GREEN PIONEER's five tanks and timing of sampling necessarily effected the ability of the Parties'/Industry's quality-control regime to produce the kind of perfect data the Court suggested should have existed; and (7) how the evidence did, in fact, preponderate in favor of finding that the Phenol was seeded before it was delivered to the BOW FLORA.

On 30 June 2014, the District Court declined to reconsider its decision, holding that "the time for [Cedar] to perform . . . a critical reading of the facts in the record was at trial or in its post-trial briefing – and not on a motion for reconsideration." Order, DE202, Appx.952-953 (Vol.III).

G.    ARGUMENT

1.    *The District Court Abused Its Discretion by (1) Prohibiting Cedar from Briefing Its Seeding Theory In Its Post-Trial Memorandum, (2) then*

33

> *Holding that Cedar's Theory Was Contradicted by the Literature and Evidence, and (3) then Refusing to Adjudge the Merits of Cedar's Reconsideration Motion*

This Court reviews the District Court's refusal to consider the merits of Cedar's Reconsideration Motion for abuse of discretion. *O'Connor v. PanAm Corp.*, 5 F.App'x 48, 51 (2d Cir.2001). A district court abuses its discretion when (1) it "applies legal standards incorrectly," *Harris v. Albany County Office*, 464 F.3d 263, 268 (2d Cir.2006), (2) it "relies upon clearly erroneous findings of fact," *Id.*, (3) it "proceed[s] on the basis of an erroneous view of the applicable law," *Id.*, (4) its decision "cannot be found within the range of permissible decisions," *Mir v. Shah*, 569 F.App'x 48, 50 (2d Cir.2014), or (4) its action "was improvident and affected the substantial rights of the parties," *Goetz v. Crosson*, 41 F.3d 800, 805 (2d Cir.1994).

The Federal Rules of Civil Procedure empower a "district court . . . to rectify its own mistakes . . . following the entry of judgment," *White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 450, 102 S.Ct. 1162, 1166 (1982), and provide litigants with an express mechanism for seeking reconsideration when they identify "a need to correct a clear error," *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992), "prevent manifest injustice," *Id.*, or (3) when "the court has misapprehended the facts, a party's position, or the controlling law."

*Barber v. Colorado*, 562 F.3d 1222, 1228 (10th Cir. 2009) (Citation omitted); *Sobel v. U.S.*, 571 F. Supp. 2d 1222, 1229 (D. Kan. 2008); *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir.1990) (explaining that Rule 59(e) "performs a valuable function" when a district court "ma[kes] an error not of reasoning but of apprehension").

While the standard for "***granting***" reconsideration motions is "strict," a movant is entitled to have the merits of such motion ***considered*** if it can "point to controlling [evidence] that the court overlooked" (i.e. "matters that can reasonably be expected to alter the court's conclusion") – provided the movant does not advance new facts, issues, or arguments nor attempts to relitigate an issue. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (Emphasis added).

In its Reconsideration Motion, Cedar directly quoted the Literature to illustrate that the Court misread it. As discussed, *infra*, the Literature states that phenol oxidation and the discoloration it eventually causes proceeds via slowly unfurling, temperature- and oxygen-dependent free-radical reactions (Minton's "seeding"): "[P]henol oxidation follows the free radical mechanism." Joglekar, Samant & Joshi, PX70E, p.138, Appx.1405-1415 (Vol.V). "[O]xygen . . . initiates free-radical chain reactions . . . [by] react[ing] directly with an organic compound [such as phenol] to produce organic radicals and hydroxyl radicals." Rivas,

35

Kolaczkowski, Beltran and McLurgh, PX70N, p.2583, Appx.1624-35, (Vol.V).
"[U]ncatalysed homogeneous phenol oxidation [is] characterized by an induction
period followed by a fast reaction phase, which is typical in the reactions governed
by free radical mechanism. During the induction period, very little or no
measurable change . . . [is] observed. After the formation of the critical free
radical concentration, the fast reaction phase start[s] during which most of the
phenol becomes oxidized." Joglekar, Samant and Joshi, PX70E, pp. 138-39,
Appx.1405-1415, (Vol.V). "During . . . oxidation, highly colored intermediate
compounds are generated" that "are the main contributors to the color observed
during the reaction." Mijangos, Varona and Villota, PX70I, pp. 5540-
41Appx.1448-1453, (Vol.V).

   The Literature is plainly "controlling evidence" because both Cedar
and Dongbu relied on it as did the District Court when it rejected Cedar's seeding
theory and deemed Cedar's experts' testimony incredible. Therefore, Cedar
pointed out a matter that justifiably should "alter the court's conclusion" that
Cedar's seeding theory is unsupported. And in doing so, Cedar did not advance
new facts, issues, or arguments; rather, it asked the District Court to reconsider
Cedar's seeding theory in light of a correct reading of the Literature. Further,
Cedar did not seek to "relitigate" its seeding theory because the District Court
functionally prohibited Cedar from briefing that theory when it ordered the Parties

to presume, for the purpose of their post-trial memoranda, that the Phenol was injured ("seeded") when Dongbu delivered it. Thus, Cedar merely sought to brief its seeding theory – for the first time – via its Reconsideration Motion – not "relitigate" that issue.

Therefore, Cedar was entitled to reconsideration, and the District Court abused its discretion by (1) incorrectly apply the legal standard governing a litigant's right to have its reconsideration motion adjudged on its merits by confusing the standard for granting a reconsideration motion with the standard for consider such a motion on its merits, (2) relying on clearly erroneous factual findings (e.g. that the Literature did not support Cedar's seeding theory), (3) by effectively prohibiting Cedar from briefing its seeding theory in its post-trial memorandum and then deciding that Cedar's was not entitled to reconsideration because it did not brief its seeding theory in its post-trial memorandum, a Catch-22 that constitutes a improvident decision, adversely affected Cedar rights. Thus, at minimum, this matter must be remanded to the District Court so it can evaluate the merits of Cedar's Reconsideration Motion.

B.  *Cedar proved the Phenol was injured when Dongbu's delivery it because (1) the Parties stipulated that Phenol discolors gradually; (2) the Literature supports Cedar's "seeding" theory; (3) the quantities of catalysts, oxidizing agents, and contaminates introduced in the experiments detailed in the Literature illustrate that the Phenol could not have discolored*

37

*instantaneously or within minutes as the District Court held; (4) Cedar's expert did not concede that the Literature contradicted Cedar's seeding theory; (5) Ertisa's post-loss documentation and Mr. Irissari's testimony on blending confirm Cedar's "seeding" theory; (6) the Phenol's carriage in the GREEN PIONEER's five tanks and timing of sampling necessarily effected the ability of the Parties' and Industry's quality-inspection regime to produce the kind of perfect data the Court suggested should have existed; and (7) the evidence clearly did, in fact, preponderate in favor of finding that the Phenol was injured when Dongbu delivered it.*

1.    *This Court May Set Aside the District Court's Factual Finding if Clearly Erroneous*

This Court may set aside the District Court's factual finding if clearly erroneous. Fed.R.Civ.P 52(a)(6). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

2.    *Dongbu Stipulated that Phenol Discolors Gradually – Not Instantaneously or Rapidly*

In their JPTS, the Parties stipulated to "undisputed material facts." Such stipulations are "binding and conclusive . . . [and] not subject to subsequent variation." *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 676-78, 130 S.Ct. 2971, 2982-83 (2010). As such, Parties may not "maintain a contention contrary to the[ir] agreed statement" because "[l]itigants . . .

38

'[a]re entitled to have [their] case tried upon the assumption that . . . facts, stipulated into the record, were established." *Id.*

Despite having stipulated to the fact that "[p]henol *gradually* [discolors] if it contains impurities or is exposed to heat or light" and that such "discoloration is *promoted* by the *action* of water, light, air and catalysts, e.g. traces of iron and copper," at trial, Dongbu referenced words and phrases from the Literature – completely out of context – to contend that Phenol discolors instantaneously or within minutes. That contention is directly contrary to the Parties' stipulated facts respecting Phenol's physical characteristics. Therefore, the District Court was obligated to "refuse[] to consider [Dongbu's] argument [that Phenol discolors instantaneously or rapidly because] that [argument] contradict[s] [the Parties'] joint 'stipulation entered at the outset of the litigation.'" *Christian Legal, supra*, 561 U.S. at 2983 (2010) (Citations omitted). Because the District Court's factual finding directly contradict the Parties' stipulated fact, those finding are clearly erroneous.

2.    *The Literature Supports Cedar's Seeding Theory*

    a.    *Wet Air Oxidation and Catalytic Wet Oxidation*
          *Fast Forward the Free-Radical Reactions*
          *Responsible for the Oxidation and*
          *Discoloration of Phenol*

Phenol oxidation and the free-radical chain reactions responsible for that process have been studied in the context of wet air oxidation ("WAO" or "WO") and catalytic wet oxidation ("CWO") – processes developed to optimize the elimination of environmentally harmful organic compounds, like phenol, from industrial waste by optimizing the conditions needed to break those compounds down to harmless water, carbon dioxide, and reaction products that are industrially useful or biodegradable.  Debellefontaine and Foussard, PX70B, Appx.1378-1388, (Vol.V).  WAO and CWO are conducted in a closed "reactor" where the concentration of organic compound, heat, pressure, agitation, air or oxygen content, and (in CWO) the catalyst (a/k/a reagent) content and/or oxidizing-agent (a/k/a oxidant) content can be manipulated.  *See* Vaidya and Vijaykumar, PX70P, §§ 2.2-2.3, Appx.1643-1653 (Vol.V) (explaining the reactor employed and the conditions manipulated (heat, pressure, agitation, oxygen and catalyst content)).  Because WAO and CWO are *designed* to eliminate organic compounds as efficiently as possible, these processes are normally run at exceedingly high temperatures (150°C-325°C) and pressures (up to 175 bar) with air or oxygen charged into the system to fast forward the otherwise slowly unfurling free-radical

reactions responsible for oxidation.[11]  By manipulating these conditions, WAO and CWO accelerate the "natural" oxidation of organic compounds to facilitate their near complete breakdown into reaction intermediates and then into final reaction products.  The District Court failed to understand the Literature in this context and failed to appreciate how the experiments discussed therein prove – beyond doubt – that this 2,003 mt parcel of Phenol could not have discolored instantaneously or "within minutes."  Instead, the District Court latched onto the words or phrases Dongbu's counsel plucked, out-of-context, from the Literature, to mistakenly conclude that the subject Phenol discolored instantaneously or "within minutes" such that – had it been injured on the GREEN PIONEER – the Parties would have discovered that injury after the Phenol had been carried on the Vessel for four days.

<blockquote>

b. *Phenol Oxidation Occurs By Way of Free-Radical Chain Reactions*

</blockquote>

"[P]henol oxidation follows the free radical mechanism. Joglekar, Samant and Joshi, PX70E, p.136, Appx.1405-1415, (Vol.V); see also, Li, Chen

---

[11] "The basic idea of the [WAO] process is to enhance contact between molecular oxygen and the organic matter to be oxidized.  High temperature conditions convert the organic matter to carbon dioxide and water. The liquid phase is maintained by a high pressure which also increases the concentration of dissolved oxygen and thus the oxidation rate. Typical conditions are 200-325ºC for temperature, 50-175 bar for pressure and 1 h[our] for the residence time  . . . ." PX70B, p. 15.

and Gloyna, PX70G, p.1688, Appx.1427-1437, (Vol.V); Rivas, Kolaczkowski, Beltran and McLurgh, PX70N, pp.2575-76, 2583, Appx.1624-1635, (Vol.V).

      c.   *After Oxygen Dissolves into Phenol, It Reacts with the Phenol to Create Radicals, and once a Critical Concentration of Radicals Develops, They Break Phenol Down into Colored Reaction Intermediaries*

           i.   Oxidation Involves an Two Initial, Sequential Steps: (a) the Physical Absorption of Oxygen by the Bulk and (b) the Chemical Reaction Between Oxygen and Phenol

               (a)   Mass Transfer of Oxygen from the Headspace to the Bulk

The overall oxidation process is controlled by two steps: (i) mass transfer of oxygen from the gas phase [e.g headspace above the bulk] to the liquid phase [the bulk]; and (ii) reaction between the dissolved oxygen and phenol.

Joglekar, Samant and Joshi, PX70E, p.138, Appx.1405-1415 (Vol.V).

Wet oxidation is a heterogeneous gas-liquid reaction and consists of the following steps taking place in series:

- transfer of oxygen from the bulk gas phase [e.g. the headspace above the phenol ("Headspace")] to the gas-liquid interface [e.g. the surface of the bulk ("Bulk")] (gas phase mass transfer);

- instantaneous saturation of the interface with oxygen;

- transfer of the dissolved oxygen from the gas-liquid interface to the bulk of the liquid (liquid phase mass transfer);

- chemical reaction in the liquid phase (either within the film of bulk of the liquid or both);

- desorption of a product like carbon dioxide from the bulk of the liquid to the gas phase.

[T]he liquid film resistance controls mass transfer and this resistance depends on the intensity of the turbulence in the liquid phase. The intensity of the turbulence in the liquid phase, in turn varies with the speed of agitation [if any].

\*     \*     \*

When limitations to the diffusion of oxygen from the gas-liquid interface to the bulk liquid exist[], the [bulk] [will be] starved of oxygen.

Vaidya and Vijaykumar, PX70P, pp.431-32, Appx.1643-1653 (Vol.V).

WAO and CWO use heat, pressure, agitation, and force-fed oxygen (either in pure form or as in air) to overcome the natural resistance put up by the Bulk's surface tension and the otherwise slow diffusion of oxygen from the Headspace into the Bulk.[12]

---

[12] "The resistance of the first step [e.g. the mass transfer of oxygen from the Headspace to the Bulk] [can be] eliminated by manipulating the speed of agitation." PX70P, p. 432. See Figures 3 and 2 on pages 9-10 here for illustration of the effect of heat on the free-radical reaction rate. See PX70H, p. 496, for a discussion of the effect of pressure and Figure 4 in PX70E for a graphic depiction of the effect of pressure on the free-radical reaction rate.

43

(b)     Dissolved Oxygen in the Bulk
Reacts with Phenol to Create
Radicals

Once sufficient quantities of oxygen dissolve from the Headspace to

the Bulk, the oxygen and phenol can react to form free radicals.    Rivas,

Kolaczkowski, Beltran and McLurgh, PX70N, p.2583, Appx.1624-1435 (Vol.V)

(explaining "oxygen . . . initiates free-radical chain reactions . . . [by] react[ing]

directly with an organic compound to produce organic radicals and hydroxyl

radicals ($HO_2\cdot$)").    "[T]he bimolecular reaction between phenol and oxygen is

considered to be the sole radical initiation step" because "the activation energy

[required for other initiating reactions] is larger [by 'several orders of

magnitude']."    *Id.* at 2581; see also Li, Chen and Gloyna, PX70G, 1687,

Appx.1427-1437 (Vol.V) ("Free radicals in the absence of initiators are formed by

the reaction of oxygen with the . . . oxidized organic compound.").

ii.    The Phenol-Oxygen Reaction Requires
Time to Create a Critical Concentration
of Radicals, and once that Critical Mass
Is Created, Phenol Breakdown Rapidly
Ensues

(a)     The Time Required to Create a
Critical Concentration of Free
Radicals Is Called the Induction
Period/Phase

44

Once free radicals begin to form, a critical concentration is required to develop before phenol oxidation commences. This period is known as the induction period, during which "***little to no oxidation occurs***":

[U]ncatalysed homogeneous phenol oxidation [is] characterized by an induction period followed by a fast reaction phase, which is typical in the reactions governed by free radical mechanism. ***During the induction period, very little or no measurable change in the phenol concentration was observed. After the formation of the critical free radical concentration, the fast reaction phase started during which most of the phenol becomes oxidized.***

\*    \*    \*

The length of the induction period [is] inversely proportional to the dissolved oxygen concentration. At high temperatures in aqueous solutions, the form in which oxygen participates in a chemical reaction is complex. The elevated temperatures necessary can lead to the formation of oxygen radicals $O\bullet$, which in turn can react with water and oxygen to form [hydrogen] peroxide ($H_2O_2$) and ozone ($O_3$) so that these four species: $O\bullet$, $O_2$, $O_3$, and $H_2O_2$ are all capable of participating in the phenol oxidation and thus reducing the induction period. In both ["the ***slow*** induction and subsequent fast reaction" see Col. 2, ¶1, sentence 1] steps, the order with respect to phenol was found to be one as shown in Fig[] 3



**[Fast Reaction Phase]**

Kinetics of wet air oxidation of phenols

Fig. 3. Effect of temperature on phenol oxidation.

**[Slow Induction Phase]**

It can be seen from [this] figure[] that the [phenol] reduction [i.e. oxidation] is slow during the initial period of the reaction and as the time advances the reduction . . . becomes fast.

Joglekar, Samant and Joshi, PX70E, pp.138-39, Appx.1405-1415 (Vol.V).

[T]he rate of reaction is initially slow in the induction period and most of the reduction [of phenol] occurs in the fast reaction regime.

*Id.* at 136.

Another author explained the process as follows:

In general, the non-catalyzed and catalyzed wet oxidations present similar features . . . . [T]hese processes have a slow conversion rate in the initial 'step' (induction period), followed by a faster stage, and finally increasing to total degradation of organic compounds contained in

the liquid phase. ***The initial degradation step has often been cited in the scientific literature as 'the induction period,' due to the time necessary to reach a critical concentration of organic radicals.***

Luna, Rojas, Melo, Benachour and Sousa, PX70H, p.494, Appx.1438-1447, (Vol.V).

In addition to being dependent on the amount of dissolved oxygen in the Bulk, the length of the induction period is highly temperature dependent and has been found to be very slow below 130ºC:

To assess the extent of the thermal degradation of phenol, WAO tests were performed with an initial phenol concentration of 2.08 g/L, in absence of [a] catalyst, at temperatures of 130, 160, and 200 ℃ while the pressure of oxygen was maintained at 3.40 MPa.

Fig. 2 [below] . . . shows [the] short induction period[] at the beginning of reactions, indicating a probable free radical mechanism . . . .



**Figure 2:** Residual fractions of phenol in non-catalyzed oxidation run at (▲) 130ºC, (♦)160ºC and (■) 200ºC; CPh0 = 2.08 g/L and P = 3.40 MPa.

[T]hermal degradation profiles [Fig.2 above] show that temperature strongly influences [oxidation]. The WAO process was more effective for phenol abatement when carried out at 200 ℃. Within 15 minutes of the reaction, the reacted phenol observed at 130 ℃ (5%) and 160 ℃ (6%) was very slight compared to that obtained at 200 ℃ (99%). *The reaction does not occur at 130 ℃ because this temperature is most likely unable to induce the formation of free radical species*.

*Id.* at 496.

        c.      During the Induction Period, the Reaction between Oxygen and Phenol Initiates Subsequent Chain Reactions which Form Hydroperoxyl Radicals ($HO•_2$), Hydrogen Peroxide ($H_2O_2$), and Hydroxyl Radicals ($HO•$), the Last of Which Controls the Rate of Oxidation

During the slow-induction period, several intermediate reactions must

occur before phenol can be oxidized during the fast-reaction step:

[M]olecular oxygen reacts directly with phenol to produce organic radicals and hydroperoxyl radical ($HO•_2$). The latter is able to react with another phenol molecule to form hydrogen peroxide ($H_2O_2$), and, through thermal decomposition, hydroxyl radicals ($HO•$). [H]ydroperoxyl radicals that activate during the reaction, increase[e] the degradation rate. The hydroxyl radical has been considered the dominant oxidizing species in several degradation processes performed in acid solutions.

Luna, Rojas, Melo, Benachour and Sousa, PX70H, Appx.1438-1447, (Vol.V).

48

While radicals form at a higher rate, the overall process occurring during the induction period is limited by the comparably slower rate of hydrogen-abstraction process that is required to produce $HO_2$ and $HO\bullet$. This rate-tempering reaction is known as the "rate-limiting" or "rate-controlling" reaction or step:

### 3.2. Mechanism of the reactions and catalysis

[T]he [free-radical] reaction is propagated by an organic radical $R\bullet$ during a coupling with molecular oxygen [reaction (2)]. [T]his radical is normally obtained by reaction between oxygen and the weakest C-H bonds [reaction (3)] and during an attack by the radical $HO_2\bullet$ obtained [reaction (4)]. Because of the temperature, the hydrogen peroxide obtained decomposes rapidly [reaction (5)] to hydroxyl radicals. Reaction (6) is a propagation step leading to hydroperoxides and, more generally, to oxidized species. ***[T]he initiation step [reaction (3)] is the limiting one and is extremely dependent on temperature . . . .*** This result explains why air oxidation, impossible at room temperature, becomes fairly rapid at temperatures greater than 250 or 300ºC

$$O-O + R^\bullet \longrightarrow ROO^\bullet \qquad \text{Reaction 2}$$

$$RH + O_2 \longrightarrow R^\bullet + HO_2^\bullet \qquad \text{Reaction 3}$$

$$RH + HO_2^\bullet \longrightarrow R^\bullet + H_2O_2 \qquad \text{Reaction 4}$$

$$H_2O_2 + M \longrightarrow 2HO^\bullet + M \qquad \text{Reaction 5}$$

$$ROO^\bullet + RH \longrightarrow R^\bullet + ROOH \qquad \text{Reaction 6}$$

The importance of free radicals in the mechanism has encouraged the search for catalysts and promoters that can over come the thermal limitation of reaction (3) [the rate-limiting reaction].

Debellefontaine and Foussard, PX70B, pp.17-18Appx.1378-1388 (Vol.V); see also

Li, Chen and Gloyna, PX70G, pp.1688-89, Appx.1427-1437 (Vol.V).

Thus, the rate-controlling step also accounts for the slow induction

period required before phenol oxidation can occur.

> d. After the Induction Period, Phenol is Oxidized into Hydroquinone and Catechol, which Are Further Oxidized to Produce Highly Colored Benzoquinone

Only after the induction period's slowly unfurling free-radical

reactions occur can phenol discolor by being broken down into "highly colored"

reaction products.

> [P]henol degradation starts with the formation of hydroquinone and catechol. These intermediates are then oxidized during the reaction to produce other organic compounds such as quinones, aldehydes, and ketones.

Luna, Rojas, Melo, Benachour and Sousa, PX 70H, p.494, Appx.1438-1447

(Vol.V).

> [P]artial oxidation of phenol generates a great number of intermediate species of different nature. The intermediate compounds generated are mainly catechol, hydroquinone, benzoquinone, maleic acid, oxalic acid, and acetic acid. The oxidation sequence comprises a first stage where phenol is decomposed to aromatic compounds with two hydroxyl groups substituted in benzene rings (hydroquinone, resorcinol, and catechol).

> Their oxidation generates quinone compounds: p-benzoquinone and o-benzoquinone.

Mijangos, Varona and Villota, PX70I, p.5538, Appx.1448-1453 (Vol.V).

> During . . . oxidation, highly colored intermediate compounds such as p-benezoquinone (yellow) and 0-benezoquinone (red) are generated (3,8). Their color comes from their quinoidal structure, which contains chromophore groups substituted in benzene rings. . . .
>
> *     *     *
>
> [T]hese quinone-type compounds are the main contributors to the color observed during the reaction.

Mijangos, Varona and Villota, PX70I, Appx.1448-1453, (Vol.V)

Based on the foregoing, Cedar submits that Minton's testimony is squarely supported by the Literature, so the District Court clearly erred when it held otherwise and deemed Minton's testimony incredible. The subject Phenol discolored by way of slowly unfurling free-radical chain reactions, which – after a critical concentration of free radicals were produced – allowed hydroperoxyl radicals (HO•$_2$), hydrogen peroxide ($H_2O_2$), and hydroxyl radicals (HO•) to form, the last of which reacted with the phenol to produce catechol and hydroquinone, which further oxidized to produce colored benezoquinone. This slowly developing process explains how the Phenol was injured before Dongbu delivered it to the BOW FLORA and why that latent defect was undiscoverable at that time.

> d. *While Phenol Discolors Rapidly in WAO and CWO Reactors, When Ratio and Proportion Are Properly Considered, It Becomes Clear*

*that the Subject 2,003 mt Parcel of Phenol*
*Would Not Have*

While the Literature does discuss reactions occurring in minutes, this does not change the fact that the overall oxidation process is a slow one. Ratio and proportion explain why. The Literature discusses experiments conducted on milliliters (ml) of phenol. Here, the subject Phenol had a volume of 1,908,212,210,687 ml. This has some striking implications.

At trial, Dongbu's counsel cited PX70I, Appx.1448 (Vol.V), to suggest that the Phenol would have discolored in minutes. Results from the CWO experiment discussed in that Article showed that "90% of the phenol degradation occurs in the first five minutes of the reaction. The rest degrades slowly, taking around half an hour to attain oxidation efficiencies greater than 98%." While it is tempting to conclude from these results that the Phenol must have discolored within minutes, in reality, this experiment's results are wholly inapposite to the determining the rate at which the subject Phenol discolored or whether the it could have already been injured (e.g. in the induction phase) when Dongbu transferred it to the BOW FLORA.

First, PX70I's CWO experiment is inapposite because it employed a catalyst and oxidizing agent. When present, the catalytic "ferrous ions react quickly with hydrogen peroxide [the oxidant] ***initially*** generating a large amount of

52

hydroxyl radicals that give rise to a fast destruction of [the phenol's and the reaction intermediates'] aromatic rings." Mijangos, Varona and Villota, PX70I, Appx.1448-1453 (Vol.V). In this way, by using a catalyst-and-oxidant cocktail, the experiment was able skip over the various induction-period reactions normally required to produce the hydroxyl radicals (HO•) responsible for oxidizing phenol into catechol and hydroquinone and then to colored benzoquinone. Thus, this experiment is not representative of the behavior of the normally slow oxidation of phenol.

And here, no metallic catalyst-and-oxidant cocktail could have fast-forwarded the phenol's oxidation process down to minutes. Dongbu was required to deliver pure phenol, and "[a]ny considerable amount of hydrogen peroxide would hardly be expected to be [inherently] present if it reacts with the phenol to produce oxidation products." PX70D, p. 366. Similarly, we know that no metallic catalyst acted on the Phenol in the Shoretanks (because the contemporaneously tested Shoretank sample and Sample D showed no change in color) and that not metallic catalyst acted on the Phenol in the GREEN PIONEER or BOW FLORA (because both had stainless steel tanks which do not initiate metallic catalytic reactions, see PX25, PX41, DXDD). Therefore, the shoreline could have been the only metallic catalyst here, but if it was, under no circumstance could the Phenol have discolored in five minutes.

In the experiment, a 500 ml solution containing 100 mg/L of phenol, 9.9 mg/L of ferrous ions (Fe(II)) (as the catalyst[13])), and 9.9 mol $H_2O_2$/mol phenol of hydrogen peroxide ($H_2O_2$) (as the oxidant[14]) was blended and tested in a CWO reactor. To have a comparable result in the subject Phenol, it would have had to have been contaminated with a comparable amount of catalyst and oxidant. In the experiment, the ratio between ferrous ions and phenol was 9.9 to 100. Thus, to discolor in five minutes, the 2003.432 mt subject Phenol would have had to have picked up 198.340 mt of ferrous ions (9.9/100 x 2003.432), which would be comparable to the mass of the entire shoreline.

However, the ferrous ions were introduced by adding ferrous sulfate heptahydrate ($FeSO_4 \cdot 7H_2O$, see Musso, PX70J, Appx.1454-1466, (Vol.5)) (ferrous sulfate plus seven (hepta-) water molecules) to the tested solution to increase the ferrous ions' ability to intermingle with the oxidant and phenol. Therefore, we actually have to determine the proportion amount of ferrous sulfate heptahydrate

---

[13] "Transition metals (e.g., iron or copper), ozone, or UV-light are employed to **activate** [free radical] reaction[s]." PX70I, p. 5538 (Emphasis added). "[The iron] [c]atalyst concentration increase the oxidation rate because iron activates the hydrogen peroxide to for hydroxyl radicals. [T]he catalyst speeds up the degradation of phenol to quinone-type compounds and, consequently, increases the rate of color formation." *Id.* at 5542.

[14] "Hydrogen peroxide is currently considered the most appropriate **reactant** used for [WAO]." PX 70I, p. 5538 (Emphasis added). "The addition of hydrogen peroxide to wet air oxidation systems has been shown to enhance the reaction rate leading to high conversions in short time periods. PX70N, p. 2583.

that would have had to have contaminated the Phenol. To do this, we must consider the molecular weight of ferrous sulfate heptahydrate to determine the ratio of ferrous ions to ferrous sulfate heptahydrate. Remembering from 9th grade chemistry that the molar weight of any compound is merely the atomic weight[15] of its constituent elements, calculating the molar weight of ferrous sulfate heptahydrate is easy. The atomic weights of Fe, S, and O are 55.845, 32.065, and 15.999, respectively. Therefore, the molecular weight of ferrous sulfate is 151.906 (55.845 + 32.065 + (15.999 x 4)). To that, the molar mass of 7 water molecules must be added. The atomic weight of H is 1.0079 and O 15.999, so the molar weight of one molecule of water is 18.0153. Therefore, another 126.1036 moles (18.0153 x 7 (hepta)) must be added to calculate ferrous sulfate heptahydrate's molar mass of 278. Thus, the ratio of ferrous ion molecule to a ferrous sulfate heptahydrate molecule is 55.845 to 278.

Considering this, for the Phenol to have discolored in five minutes, it would have had to have been contaminated with 987.35 mt of ferrous sulfate heptahydrate (278/55.845 x 198.34). This is an absurd amount of contamination that would have been recognized in the Phenol's ullage logs, which tracks the quantity of Phenol carried. See PX31, PX33, PX56. Because there was no

---

[15] Atomic weight is specified on the Periodic Table.

increase in the Phenol's ullage,[16] the Phenol could not have discolored in five minutes.

This conclusion becomes more evident when the ratio of oxidant to phenol is considered. In the experiment, hydrogen peroxide was blended into the solution studied at the ratio of 9.9 moles of hydrogen peroxide to 1 mole of phenol. The molecular weight of hydrogen peroxide is 34.0147. The molecular weight of phenol is 94.11. Considering molecular weight, the hydrogen peroxide to phenol ratio in PX 70I's experiment was 336.745 (9.9 x 34.0147) to 94 (1 x 94). Applying this ratio to the quantity of the Phenol, would mean that it would have had to have been contaminated with 7,177.27 mt (2003.432/94 x 336.754) of hydrogen peroxide (in addition to the 987.35 mt of ferrous sulfate heptahydrate) to have discolored in five minutes. In other words, the Phenol would have had to have been contaminated with 8,164.35 mt of a known catalyst-and-oxidant cocktail to discolor "within minutes" as the District Court held. This absolutely beyond the realm of possibility because BOW FLORA Tank 13C was physically incapable of holding that volume of contamination, let alone that amount plus the 2003.432 mt of Phenol shipped in that Tank.

---

[16] In fact, there was a shortage of Phenol at Rotterdam. See Letter of Protest, PX56, Appx.1064 (Vol.IV).

Thus, ratio and proportion are critical to understanding the findings discussed and conclusions drawn in the Literature. The subject Phenol could not have discolored instantaneously or in minutes unless proportionally sufficient quantities of catalyst and oxidant or colored contaminate were introduced to the bulk in a moment. The introduction of such vast quantities of contamination simply could not have occurred considering the physical confines of Tank 13C. Therefore, Cedar respectfully submits that the Phenol's discoloration could only have occurred via "seeding."

   3.   *Sample A Confirms Cedar's Seeding Theory and Proves Dongbu Breached the Contract*

Cedar's seeding account is also confirmed by Sample A. Sample A had was retained shoreside in Ulsan by GSI in the same way Sample D was retained shoreside in Ulsan by SGS. Therefore, had no seeding occurred, when both were jointly retested by the Parties in August 2005, they should have come back with identical results. That is, Sample A should have remained at 3-5 Hazen like Sample D did. However, it did not. Its color (at least) doubled, which Cedar submits proves that, like all the Phenol exposed to the GREEN PIONEER, it too had been seeded. Further, Sample A was off-hue. Cedar's Harfouche testified that 10 Hazen-Off hue is not the same as 10-Hazen such that the Court erred when it stated that Sample A was on-specification. Tr. 375:25-379:1 (Harfouche).

Therefore, Sample A proves Cedar's seeding account and proves that Dongbu breached the Parties' Contract.

      4.    *Ertisa's Documentation & Irissari's Testimony On Blending Actually Support Cedar's Seeding Account*

Ertisa's documentation supports Cedar's seeding account. After the Phenol was discovered discolored, Ertisa explained in its insurance-claim materials:

> When [Phenol] is in the presence of impurities or it is influenced by the light, the air or some catalysers like copper or iron and sharply increases of temperature over 60°C, the product can take colour. ***Once the process of coloration begins, it is irreversible even if the causes that produce the colouration disappear.***

PX76, Anexo II-B. Mr. Irissari's testimony also supports Cedar's "seeding" account. When asked about the dangers of attempting to blend on- and off-specification phenol, Mr. Irissari testified as follows:

> Mr. Lillis: When you do blending, do you have any concerns about putting bad product with good product?
>
> Mr. Irisarri: Always do. *Because the color in phenol, and this is a technical issue, when phenol has deteriorated and you mix it with good product, the deterioration **will continue**.*

TT 433:1-15 (Irisarri) (Vol.II).

58

In this way, Mr. Irisarri's testimony confirms Cedar's seeding account. In certain circumstances, slightly off-color phenol can be blended with on-specification phenol and, provided it is but to an application within a reasonable time thereafter, no issues should arise. However, given time, blended phenol will ultimately deteriorate back off-color once the free-radical reactions spread through the healthy bulk and again reach the critical concentration required to eventually lead to the creation of enough benzoquinone to discolor the product.

### 5. *The Data Did Not Produce a Perfect Upward Slope Because of a Lack of Homogeneity*

The data points provided by tests run on the samples pulled over the course of the Phenol's carriage do not provide a perfect upward slope. However, this is explained when the physical reality of the Phenol's carriage is properly considered. While it make sense to assume that the data should provide a clear upward progression if (1) the Phenol was homogenously stored in the first place (e.g. in one tank), (1) carried homogenously in the GREEN PIONEER (e.g. in one tank), and then transferred into the BOW FLORA, this was not the reality of the Phenol's carriage. Here, the Phenol originated in two different storage tanks – two distinct environments. Thereafter, some of the Phenol from one shoretank was pumped into some but not all of the GREEN PIONEER's five tanks and the balance into the others. That is, the Phenol was exposed to five additional,

individual, and distinct environments for the 4-day voyage to Ulsan. And those five tanks carried varying amounts of the Phenol: 467.418 in 2P, 462.762 in 2S, 459.250 in 3P, 478.888 in 3S, and 135.552 in 4C. PX 24. At Ulsan, the Phenol froze in the GREEN PIONEER's lines. Once it was molten, for the first time ever, the product was commingled into Tank 13C aboard the BOW FLORA. *Id.* After ten minutes, first-foot samples were drawn from the first foot, which necessarily only came from one of the five GREEN PIONEER Tanks. Other samples were drawn six hours later after completed. *Id.* However, Cedar submits that that was insufficient time, especially in the absence of any agitation mechanism, to sufficiently homogenize the bulk and maintains that this perfectly explains the variations in the sampling data.

Despite not providing a perfect upward slope, Cedar submits that the sample information in the record, taken together, when plotted with date and time of sampling in mind, does illustrate a clear exponential progression similar to that found in Figure 3 of PX 70E:



Cedar entered all sampling data into Excel and asked it to plot an exponential "trend line," one function available on the program, which produced the above graph. While not perfect in representing the slow-induction and fast-reaction steps detailed herein, it is an accurate representation of available data that lends support to Cedar's seeding account. Based on this and the foregoing analysis, Cedar respectfully submits that it has fully substantiated it seeding account independent of any testimony deemed incredible by the Court.

6.     *Minton Never Acknowledged that PX70C, PX70D, PX70I, or PX70J Contradicted Cedar's Seeding Theory*

61

Contrary to the Court's holding, Mr. Minton never acknowledged that anything in Exhibits 70-C, 70-D, 70-I, or 70-J contradicted Cedar's "seeding" theory.

*PX70C*

Beyond asking him to identify its purpose, Dongbu's counsel did not question Mr. Minton on Exhibit C. TT329:14-18 (Minton), Appx. (Vol.II).

*PX70D*

Dongbu's counsel asked about introducing quinone into phenol and the subsequent color change and the combined effect of water and sunlight:

Q:    Sir, isn't it true that when contaminants hit phenol, there is an immediate reaction, not a slow reaction over time?

A.    No, not at all. Quinone is a red dye. You can dye phenol and instantly color it, if you have a very colored contaminant. If, on the other hand, you damage it by overheating, for example, it doesn't change color at all to start with. It takes days for the color to develop and it goes on developing. So they are two completely distinct mechanisms of discoloration.

TT330:10-18.

In neither response did Mr. Minton acknowledge that Exhibit 70D contradicted Cedar's seeding account of the Phenol's damage,

*Exhibit 70I*

62

Cedar has already explained why the Exhibit 70I's statement that "the phenol solution undergoes a fast color change from colorless to dark brown" is not applicable here. Further, Minton did not acknowledge that PX70I contradicted Cedar's seeding account of the Phenol's damage because it does not:

Q. Again, when phenol is contaminated, it's a quick process?
A. No. It depends on what you contaminate it with.

TT336:24-25.

PX70J

The same is true for Exhibit 70J. Dongbu's counsel asked:

Q: Is the phenol contamination in this case something that you would consider to be an irreversible oxidation?
A. Well, first of all, we don't know it's a contamination. But, secondly, the discoloration of phenol is irreversible and it is believed to be an oxidative process.
Q. Do you see where it states that we have irreversible oxidations?
A. I do.
Q. "A rate which is too fast for determining their potential by titration of the phenol with the oxidizing agent." [D]o you see that language?
A. I do.
Q. Would you agree with me, sir, that when you have an irreversible oxidation, the rate of color degradation is a fast rate?
A. In the presence of an oxidizing agent, yes, but we don't have one.
Q. Because you don't know what is the cause.
A. There is no candidate oxidizing agent in this case.

TT338-339.

C. *The District Court erred by not holding Dongbu liable for breaching the Parties' Contract because*

63

> *Cedar proved the Phenol was injured when Dongbu delivered it and the Parties stipulated that Dongbu would be liable upon such a showing.*

The Parties stipulated that, if Cedar proved that the Phenol was injured when Dongbu delivered it, Dongbu would be liable. Cedar has proven that the Phenol was injured when Dongbu delivered it. Therefore, Dongbu is liable for breaching the Parties' contract, and this matter must be remanded to the District Court for an evaluation of Cedar's damages.

## CONCLUSION

The Literature and physical reality of the Phenol's carriage confirm the Phenol discolored by way of slowly unfurling free-radical chain reactions that occur when phenol oxidizes and thereby discolors. This process explains how the Phenol could have been injured before being transferred to the BOW FLORA but the not yet discolored as of the date of transfer (24 May 2005). By delivering Phenol with such an embryonic defect to Cedar's nominated vessel, Dongbu breached the Parties' Contract and is liable for Cedar's damages. The Distrcit Court clearly erred when it held otherwise. Therefore, Dongbu is liable for breaching the Parties' Contract and this matter must be remanded to the District Court for an evaluation of Cedar's damages.

## MOTION FOR ORAL ARGUMENT

Cedar Petrochemicals, Inc. respectfully requests oral argument to aid this Court's consideration of the issues developed by this brief.

Date: 1 December 2014

Respectfully submitted,
Cedar Petrochemicals, Inc.

By:    s/ John T. Lillis, Jr.
Kennedy Lillis Schmidt & English
75 Maiden Lane, Suite 402
New York, New York 10038-4816
(212) 430-0800
(212) 430-0810 (fax)
jlillis@klselaw.com

# CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure
28 and 32.

Respectfully submitted,
Cedar Petrochemicals, Inc.

By: ____s/ John T. Lillis Jr.____
Kennedy Lillis Schmidt & English
75 Maiden Lane, Suite 402
New York, New York 10038-4816
(212) 430-0800
(212) 430-0810 (fax)
jlillis@klselaw.com

CERTIFICATE OF SERVICE

I hereby certify that on 1 December 2014, I electronically filed the foregoing with the Clerk of the Second Circuit Court of Appeal using the CM/ECF system, which will send notification of such filing to the following:

MCDERMOTT WILL & EMERY LLP
Attorneys for Appellee/Cross-Appellant,
Dongbu Hannong Chemical Co., Ltd.
Michael R. Huttenlocher, Esq.
340 Madison Avenue
New York, New York 10173-1922
Tel: (212) 547-5482
Fax: (212) 5477-5444

Date: 1 December 2014

Respectfully submitted,
Cedar Petrochemicals, Inc.

By: ___s/ John T. Lillis Jr.___

John T. Lillis Jr.
Kennedy Lillis Schmidt & English
75 Maiden Lane, Suite 402
New York, New York 10038-4816
Tel: (212) 430-0800
Fax: (212) 430-0810
jlillis@klselaw.com
nwilliams@klselaw.com